# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

JERRY T. COBLE,             )
                     )
       **Plaintiff,**       )
                     )
**v.**                   )     **No. 3:08-0314**
                     )     **Judge Echols**
                     )
**CITY OF WHITE HOUSE,**   )
**TENNESSEE, CURTIS CARNEY, JR.,**   )
**and SCOTT BILBREY,**   )
                     )
      **Defendants.**     )

## MEMORANDUM

This is a civil rights action alleging excessive use of force brought by Plaintiff Jerry T. Coble ("Coble"), a resident of Sumner County, Tennessee, against the City of White House, Tennessee ("the City"), and city police officers Curtis Carney, Jr. ("Officer Carney") and Scott Bilbrey ("Officer Bilbrey"). Pursuant to a Stipulation of Dismissal entered on October 17, 2008, Officer Bilbrey was dismissed from the suit. (Docket Entry No. 24.) Now presented for ruling are Officer Carney's Motion For Summary Judgment (Docket Entry No. 33) and the City's Motion For Summary Judgment (Docket Entry No. 37). These motions have been fully briefed by the parties.

In the First Amended Complaint, Coble asserted nine federal and state-law claims against the various defendants. The summary judgment motions concern the eight claims remaining after Officer Bilbrey's dismissal, including three federal claims: excessive use of force in violation of the Fourth, Fifth and Fourteenth Amendments against Officer Carney pursuant to 42 U.S.C. § 1983 (Count One); false arrest against Officer Carney pursuant to 42 U.S.C. § 1983 (Count Three); and failure to implement appropriate policies as to the excessive use of force against the City pursuant to 42 U.S.C. § 1983 (Count Four). Also, five state-law claims remain: negligence against the City (Count Five); negligent infliction of emotional distress against the City (Count Six); negligent training and supervision against the City (Count Seven); reckless infliction of emotional distress against Officer Carney (Count Eight); and assault and battery against Officer Carney (Count Nine).

1

Because the Defendants are moving for summary judgment, the Court must consider the facts in the light most favorable to the non-moving party, Coble, to the extent his version of the facts is supported by the record.

# I. <u>FACTS</u>

On the evening of April 6, 2007, 59-year old Coble patronized Bob & Rhonda's Sports Grill in White House, Tennessee, where he consumed one or more beers. He left the establishment around 10:40 p.m., and climbed into his pickup truck to head for home. He pulled out from the parking lot and entered Highway 31W traveling north in front of Officer Carney's police patrol car. Officer Carney watched as the pickup truck crossed the white line on the right side of the road two or three times. Officer Carney activated the video camera on his dashboard, but the video that was taken does not show Coble's truck weaving on the highway. (Docket Entry No. 35, Carney Aff., Ex. 1, DVD.) Officer Carney activated the blue lights on his patrol vehicle, but the pickup did not stop. Coble continued driving until he reached the driveway of his home, where he activated the right turn signal on his truck and turned into his driveway. As Coble made the turn, he saw the blue lights of the police car out of the corner of his eye, but he thought the police car was after someone driving in front of him. Coble drove all the way up to the end of the driveway toward the house, watching the blue emergency lights from the patrol car through his rear view mirror. Officer Carney was not familiar with the property and called for police assistance.

When Coble reached the top of his driveway, he stopped the pickup, stepped out the driver's door, and walked to the back of the pickup. Officer Carney immediately ordered him to stay in the truck. (DVD.) Coble did not return to the truck, but asked, "What's going on, man?" (Docket Entry No. 29, Coble Depo. at 76; DVD.) Officer Carney again ordered Coble to stay in the truck. Coble then said, "I live here and I'm going home. What is your problem?" (Coble Depo. at 76.) Officer Carney walked up to Coble near the back of the pickup and said seven times, "Come here!" (DVD.) Coble ignored Officer Carney's commands, and finally asked, "What for?" (DVD.)

2

Officer Carney asked Coble if he had any guns or knives. Coble did not respond to the question. Coble had his hands in his jacket pockets. Officer Carney asked a second time if Coble had any guns or knives. Coble then briefly pulled his hands out of his pockets, but he continued to ignore Officer Carney's orders and engaged in a verbal exchange with Officer Carney, telling him he was out of his jurisdiction. (DVD.) Coble put his hands back in his jean pockets and told Officer Carney, "You need to get off my property now!" Coble then turned away from Officer Carney and walked toward his house. (DVD.) Officer Carney testified Coble's speech was slurred during this encounter. (Carney Depo. at 73.)

Officer Carney removed a canister of pepper spray from his holster and followed as Coble walked toward his house. As Officer Carney moved out of range of his patrol car's video camera, he yelled at Coble, "I'm gonna spray you!" (DVD.) The video did not capture visually what occurred as the two men left the view of the camera, but the audio portion of the recording gives some clues about what happened. As Officer Carney followed Coble, he yelled, "Stop!" at least three times. (DVD.) Coble admitted that Officer Carney told him to stop or he would spray him, but Coble did not stop. (Coble Depo. at 83-84.)

According to Coble, as he walked away toward his house, Officer Carney reached around Coble's right side and sprayed Coble in both eyes with the chemical agent. (Coble Depo. at 80, 87.) Coble testified he immediately stopped where he was, did not say anything, and began rubbing his eyes. (Id. at 82-83.) "It was almost instant. He sprayed me, I rubbed my eyes and snap, there went my foot off my leg." (Id. at 83, 89.) Coble claimed that Officer Carney kicked him in the leg. (Id. at 84.) Officer Carney denied that he kicked Coble; rather, he used a tactical maneuver to take Coble to the ground to effectuate an arrest. Officer Carney further testified that he understood the police department's use of force policy and the use of force continuum expressed in the policy, and he tried to follow the policy in stopping Coble, using the least amount of force necessary. (Id. at 33-36, 40-41, 97.) Coble denied that Officer Carney used a take-down maneuver on him and insisted that Officer Carney kicked him and "I just kind of fell." (Coble Depo. at 92-95, 97, 108.)

According to Coble, after he fell, Officer Carney immediately got on top of him, put a knee in his back, pulled his arms around from the front to the back, and handcuffed him. (Id. at 94-95, 97.)

Coble denied that there was any scuffle once he was on the ground. (Id. at 94.) However, his own testimony and the audio recording of the incident reveal otherwise. Coble admitted that, as he rubbed his face, Officer Carney tried to get his arms behind his back, and "I was resisting." (Coble Depo. at 118-119.) Officer Carney can be heard on the audio recording yelling twice, "I told you to stop!" and four times Officer Carney can be heard screaming, "Put your hands behind your back!" After the fourth time, he yelled, "Do it now!!" (DVD.) Coble asked Officer Carney what he was doing. The sound of one handcuff closing can be heard. Officer Carney then yelled, "Let go of your hand! Let go of your hand!"

Officer Bilbrey arrived at this point. According to his testimony, Coble was lying face down on the concrete driveway and Officer Carney was on top of him commanding Coble to give him his hands. (Docket Entry No. 47, Ex. 1, Bilbrey Depo. at 14-15.) Officer Bilbrey attempted to use pepper spray on Coble, but his canister malfunctioned and a few drops came out instead of a stream, so he re-holstered the canister. (Id. at 15.) Officer Bilbrey then got down on the ground to help Officer Carney take physical control of Coble by putting his knee into Coble's shoulder and pulling Coble's right arm out from under his body. According to Officer Bilbrey, Officer Carney had managed to put one handcuff on Coble's other arm. (Id. at 18.)

The audio recording discloses the sound of the second handcuff closing and one of the officers says, "Get up!" The sound of shuffling can be heard for several moments, as if all three men were walking from one point to another. Coble then cried out, "My leg! My leg's broke! You broke my leg!" The shuffling stopped and an officer said, "Sit down!" Coble cried out repeatedly, "You broke my leg!" An officer responded, "I see that, calm down!" Medical assistance is then summoned. (DVD.)

Coble testified that he screamed, "You broke my leg," and that he called Officer Carney "everything I could think of. And he finally stopped." (Id. at 99.) The audio recording does not

confirm that Coble called Officer Carney names or that Coble had to do so in order for Officer Carney to stop walking him on a broken leg. Coble also testified that Officer Carney turned him loose and he "splattered out there on this new concrete on my face." (Id.) Again, the audio recording does not reveal any sounds that would lead the listener to believe that Coble had been "turned loose" to splatter on the pavement on his face. To the contrary, Officer Carney testified that Coble told them his leg was broken and when Officer Carney looked down, he saw that Coble's leg was, in fact, broken. He also testified that "[a]t that time we immediately sat him down." (Carney Depo. at 99.) Officer Carney denied that he dropped Coble to the pavement (id. at 99-100), and Officer Bilbrey confirmed that the officers immediately lowered Coble to a sitting position. The officers' testimony is consistent with the audio recording which reveals an officer told Coble to "Sit down!" Officer Bilbrey examined Coble's foot and realized Coble had suffered a compound fracture of his right ankle. The broken tibia and fibula bones projected through the skin on the inside of Coble's right ankle. Officer Bilbrey applied pressure to stop the bleeding and called for emergency first responders, who arrived within minutes. (Bilbrey Depo. at 28-29.) According to the dispatch log and Officer Carney's testimony, six minutes passed from the time Officer Carney arrived at Coble's residence to the arrival of the emergency medical personnel. (Carney Depo. at 61-64.)

Neither officer offered water to Coble to flush his eyes of the chemical spray. Officer Carney testified that such care is ordinarily left to emergency first responders who are called to the scene where chemical spray was used. (Carney Depo. at 37, 95.) Because of Coble's injury, Officer Bilbrey took photographs of the blood stains on the driveway.

Coble was transported by helicopter to Vanderbilt University Medical Center in Nashville, where he was treated in the emergency room shortly after midnight and underwent orthopedic surgery on the morning of April 7, 2007. Coble told the doctor in the emergency room that he had been kicked by police. Dr. Phillip J. Kregor was Coble's treating orthopedic surgeon at Vanderbilt. Dr. Kregor testified that Coble suffered a painful open ankle fracture, with the tibia broken in two places and the fibula broken in one place. Based on the medical history given in the medical

records, Dr. Kregor testified that Coble's ankle fracture occurred as the result of an altercation Coble had with the police.

Dr. Kregor testified that, in his opinion based on reasonable medical certainty, Coble's injury was caused by relatively significant force. Such an injury would not occur by simply twisting the ankle. He could not say whether the injury occurred as the result of a kick, a twist, or a fall. He also could not say whether any resisting force by Coble played a part in the injury.

During surgery, Dr. Kregor cleaned the tissue, repaired the bone fractures with metal plates and screws, and closed the wounds with sutures. The surgery lasted approximately 2 ½ to 3 hours. Coble was discharged from the hospital on April 9, 2007. He was unable to put any weight on his leg for eight weeks, and he took pain medication and antibiotics. Dr. Kregor removed most of the hardware from Coble's ankle in June 2008. In August 2008 Coble continued to complain of stiffness and pain in his ankle and decreased range of motion. X-rays showed mild arthritic changes taking place at the site of the injury. Dr. Kregor calculated that Coble suffered a permanent injury resulting in seventeen percent (17%) impairment of the right lower extremity, which equates to seven percent (7%) impairment of the whole person. Coble continues to have some limitations and pain, and his ankle will not be normal. (Docket Entry No. 29, Ex. 8, Kregor Depo.) Coble has not had any psychological or psychiatric treatment as a result of his injury.

Coble retained Dr. John W. Bacon to review the medical records and give an opinion about the causation of his injury. Dr. Bacon's opinion is that the injury Coble suffered to his right ankle was the result of a twisting type mechanism, likely from being wrestled to the ground. Coble's injury could not have been caused by a kick because a kick would have produced a different fracture pattern. Dr. Bacon determined that Officer Carney's version of the incident–that he used a tactical maneuver to take Coble to the ground–was consistent with Dr. Bacon's opinion as to the cause of Coble's injury. (Docket Entry No. 29, Ex. 7, Bacon Depo.)

Officer Carney arranged to have a blood sample taken from Coble at Vanderbilt at approximately 2:30 a.m. on April 7, 2007. The Tennessee Bureau of Investigation performed a blood alcohol test on the sample. The test showed Coble's blood alcohol level was 0.16.

Officer Carney charged Coble with second offense DUI and resisting arrest. Coble entered a guilty plea in General Sessions Court for Sumner County to first offense DUI and resisting arrest. On July 3, 2007, Coble was sentenced on the DUI charge to serve 11 to 29 days in the Sumner County jail at 75%; however, after serving 10 days the balance of the sentence was suspended, upon payment of a fine and costs. For the resisting arrest conviction, the court sentenced Coble to 180 days in jail at 75%; to be served concurrently with the DUI sentence.

Officer Carney, who was 22 years old at the time of Coble's arrest, served in the Air Force from 2003 to 2006. He was a member of the military police, had Air Force training in the use of force, and trained as a military policeman with the Delaware State Police. (Carney Depo. at 58.) He does not have any significant martial arts training.

Officer Carney was employed by the City on August 4, 2006. The White House Police Department's General Directives Manual includes specific provisions for the training of recruit officers, field training, and weapons and use of force. Officer Carney attended and graduated from the police academy at Walters State Community College in Morristown, Tennessee. His training consisted of a ten-week course covering a variety of topics, including the use of force. The instruction received by Officer Carney at Walters State included a variety of take-down maneuvers, including the one Officer Carney used on Coble. Officer Carney was certified by the State of Tennessee Police Officers' Standards and Training Commission ("POST") on December 6, 2006, five months before Coble's arrest.

According to the City's General Directives Manual, after completion of all POST Commission requirements, all recruit officers and lateral-entry officers must complete a prescribed Field Training Officer Program. Recruit officers are assigned to the Field Training Officer for a period of fourteen (14) weeks. While in the Field Training Program, the officers are evaluated on

7

a daily basis with a final evaluation upon completion of the program. Officer Carney completed the Field Training Program.

The City's General Directives Manual sets forth the escalating use of force continuum that should be used when the use of force is necessary. The manual prohibits the use of unreasonable force by its police officers. Officer Carney was aware of the City's use of force policy pursuant to the use of force continuum and testified that he tried to follow the use of force continuum in dealing with Coble. Two or three times a year, the City requires the entire police force to go through eight (8) or sixteen (16) hours of defensive tactics classes.

Prior to Coble's injury, Stanley Hilgadiack, the City's police chief, had not received any prior complaint about Officer Carney. Sgt. Ring notified Chief Hilgadiack at home shortly after Coble's arrest that Coble had been injured and would be taken to Vanderbilt. Chief Hilgadiack signed Officer Carney's use of force report about the incident. The use of force report indicated that Officer Carney used chemical spray on Coble, but it did not describe in detail the take-down maneuver Officer Carney used. Chief Hilgadiack did not speak to Officer Carney directly about the injury to Coble. Rather, he received information through the chain of command from Sgt. Ring and Sgt. Hammonds. (Docket Entry No. 29, Ex. 9, Hilgadiack Depo.)

Chief Hilgadiack learned that Sgt. Hammonds asked Officer Carney what he did to break Coble's leg and Officer Carney said, "Well, I'll show you." Officer Carney then demonstrated the maneuver on a female police dispatcher, and as he did so, the woman's ankle popped. Officer Carney revealed that he learned the maneuver during his academy training at Walters State. Sgt. Hammonds told Officer Carney not to use that maneuver ever again.

Sgt. Hammonds reported to Chief Hilgadiack that Coble's injury was caused by a take-down maneuver in which Officer Carney's foot was placed beside Coble's foot and Coble was then twisted and put on the ground. Chief Hilgadiack agreed with Sgt. Hammonds that the maneuver should not be used. The City does not train its officers to use the maneuver, and in his twenty-eight (28) years

of law enforcement experience, Chief Hilgadiack was not taught the take-down maneuver that Officer Carney demonstrated for Sgt. Hammonds.

Chief Hilgadiack discussed the take-down maneuver with Sgt. Ring, who also informed Officer Carney that the maneuver was not a tactic the police department used. Chief Hilgadiack also ensured that the police department's trainer, Eric Enck, knew that the maneuver was not to be shown to officers or used in the field. Officer Carney was not reprimanded or disciplined by the City for using the maneuver on Coble, nor was he disciplined on any matter at any other time.

Officer Bilbrey testified that he was not aware of the take-down maneuver Officer Carney used to take Coble to the ground until Officer Carney described it to him, and that the City did not teach or train its officers to use that type of maneuver. (Bilbrey Depo. at 33-34.) He also pointed out, however, that he and Officer Carney attended different law enforcement training academies and, as a ten-year police veteran, Officer Bilbrey attended the academy many years before Officer Carney. (Id. at 33.)

James Kubic teaches defensive tactics at the Tennessee Law Enforcement Training Academy. He testified he does not teach the type of take-down maneuver Officer Carney used in arresting Coble. (Docket Entry No. 47, Ex. 2, Kubic Depo. at 26.) The maneuver is not designed to break a person's leg, but it could be an unanticipated result of using the technique. (Id. at 31-32.)

Defendants' law enforcement expert, Robert Allen, offered his opinion that the amount of force Officer Carney used to arrest Coble was appropriate, reasonable, and justifiable under the circumstances. He further opined that Officer Carney acted in accordance with his training and with nationally accepted police training techniques during all phases of the incident. (Docket Entry No. 32, Ex. 6, Allen Expert Disclosure).

It is undisputed that Coble lacks knowledge of any policy or custom of the City related to the use of excessive force during arrest that could have proximately caused his injuries. He has no knowledge of any person who has accused a City police officer of using unreasonable force.

9

Coble's claims against the City are based on his single interaction with Officer Carney. Coble has no knowledge of the training methods used by the City to train its officers. He also knows nothing about what the City did to supervise Officer Carney.

## II.  STANDARD OF REVIEW

A party may obtain summary judgment if the evidence establishes there is not a genuine issue of material fact for trial and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Covington v. Knox County School Sys., 205 F.3d 912, 914 (6th Cir. 2000). The moving party bears the initial burden of satisfying the court that the standards of Rule 56 have been met. See Martin v. Kelley, 803 F.2d 236, 239 n.4 (6th Cir. 1986). The ultimate question to be addressed is whether there exists any genuine issue of material fact that is disputed. See Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986); Covington, 205 F.3d at 914 (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)). If so, summary judgment is inappropriate.

To defeat a properly supported motion for summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine issue of material fact for trial. If the party does not so respond, summary judgment will be entered if appropriate. Fed. R. Civ. P. 56(e). The nonmoving party's burden of providing specific facts demonstrating that there remains a genuine issue of material fact for trial is triggered once the moving party shows an absence of evidence to support the nonmoving party's case. Celotex, 477 U.S. at 325. A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. In ruling on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party, drawing all justifiable inferences in its favor. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## III.  ANALYSIS

To prove a claim under 42 U.S.C. § 1983, Coble must show (1) the deprivation of a right secured by the Constitution or laws of the United States and (2) the person causing the deprivation was acting under color of state law. Mezibov v. Allen, 411 F.3d 712, 716-717 (6th Cir. 2005). Coble

agrees in the summary judgment briefing that his excessive force claim is properly analyzed only under the Fourth Amendment, Graham v. Conner, 490 U.S. 386 (1989), and therefore, his excessive force claims brought under the Fifth and Fourteenth Amendments are moot.

Officer Carney acted under color of state law at the time he arrested Coble. Defendants contend that Coble's § 1983 claims must fail because Coble is estopped from maintaining a claim for excessive use of force after he pled guilty and was convicted of resisting arrest, Officer Carney is entitled to qualified immunity, and Coble has not shown that the City adopted a custom or policy of excessive use of force that would make the City liable for Coble's injury during his arrest.

**A. Excessive force claim**

*1. Effect of prior conviction for resisting arrest*

Under Heck v. Humphrey, 512 U.S. 477, 487 (1994), a § 1983 plaintiff is barred from advancing claims that, if successful, would imply the invalidity of a prior conviction or sentence. Under Tennessee law, a police officer's use of unreasonable or excessive force is a defense to a charge of resisting arrest. Roberts v. Anderson, 213 Fed. Appx. 420, 427 (6th Cir. 2007) (citing Tenn. Code Ann. §§ 39-16-602 and 39-11-611(e)(1)-(2)). As a result, a plea of guilty to a charge of resisting arrest and the resulting conviction necessarily include a finding that the officer did not use excessive force. Id. A plaintiff's excessive force claim is barred if the plaintiff could have raised excessive force as a defense to a charge, but instead chose not to contest the charge. Cummings v. City of Akron, 418 F.3d 676, 683 (6th Cir. 2005).

The bar to raising an excessive force claim applies only when the force occurred either prior to or was inextricably intertwined with the suspect's resistance to arrest. Lowe v. Henson, 2007 WL 2022205 at *5 (E.D. Tenn. July 11, 2007). Heck does not bar a claim for excessive force that occurred after the suspect was handcuffed and brought under control. Id.

Coble contends that his excessive force claim is not barred by Heck. He argues that his resistance to arrest ended at the moment Officer Carney sprayed him in the face with chemical spray. At that moment, when he stopped to wipe his eyes, he claims he was no longer able to resist.

11

Therefore, the excessive force Officer Carney used to break Coble's leg, whether it was a direct kick or a twisting take-down maneuver, occurred after Coble's resistance ended and thus, can form the basis for a § 1983 claim.

But Coble's position does not square with testimony given at his own deposition or with the other evidence available. Coble himself testified: "It was almost instant. He sprayed me, I rubbed my eyes and snap, there went my foot off my leg." (Coble Depo. at 83, 89.) Coble was not handcuffed and under control at the moment of these events. Rather, he testified, once he was on the ground, Officer Carney climbed on his back, put a knee in his back and tried to pull his arms behind his back to handcuff him. Coble admitted he resisted as Officer Carney tried to get both of his arms behind his back. Coble's own testimony is confirmed by the audio recording and Officer Bilbrey's testimony that he arrived on the scene to see Coble lying face down on the ground with Officer Carney on his back, struggling to get Coble's second wrist into the handcuffs. Officer Bilbrey tried to use chemical spray on Coble and when that failed, he put his knee into Coble's shoulder and brought Coble's arm behind his back for handcuffing. The audio recording reveals that Officer Carney commanded Coble four times to put his hands behind his back and twice to "let go of your hand." In light of Coble's admission that he resisted, one could only conclude from listening to the audio recording that the physical struggle for control between Officer Carney and Coble continued after Coble hit the ground. Once the handcuffs were placed on Coble's wrists, there was no further scuffling, and Coble admitted as much.

In light of this evidence, the Court concludes that Officer Carney's use of force to bring Coble under control and handcuff him was inextricably intertwined with Coble's resistance to arrest. See Lowe, 2007 WL 2022205 at *5. As such, his § 1983 claims for the excessive use of force resulting in his ankle fracture are now barred by his state guilty plea and conviction to resisting arrest. Id.; Roberts, 213 Fed. Appx. at 427; Cummings, 418 F.3d at 683; Owens v. Chrisman, 2008 WL 217118 at * (M.D. Tenn. Jan. 23, 2008).

Coble contends, however, that Officer Carney's actions in walking him several steps on the driveway with exposed bone, dropping him face down on the driveway, and failing to flush his face with water after using chemical spray as required by the police department policy on use of force constitute actionable excessive force. He further argues that these aspects of his excessive force claim are not barred by his guilty plea to resisting arrest because the events occurred after Coble was handcuffed and brought under control.

Defendants respond that during litigation Coble did not rely on these events to support his excessive force claim, but raised them for the first time only after Defendants argued in support of the summary judgment motions that Coble's excessive force claims are barred by the guilty plea. They contend the First Amended Complaint did not give them fair notice that these allegations were part of the excessive force claim.

In paragraph 29 of the First Amended Complaint, Coble alleged: "Upon information and belief, Defendant Carney and/or Defendant Bilbrey moved Plaintiff approximately eight (8) steps after his right leg had been broken, and dropped him face down on the concrete driveway resulting in additional injuries and pain to Plaintiff's face and head." (Docket Entry No. 17.) In paragraph 37, Coble alleged that, "[i]n committing the acts complained of herein, Defendant Carney acted under color of state law[.]" In paragraph 38 (emphasis added), Coble alleged that Officer Carney used excessive force, "*including* the unreasonable use of mace, handcuffs, and a right leg kick to effectuate a D.U.I. arrest."

The Court finds that these paragraphs sufficiently placed the Defendants on notice that Coble was alleging as part of the excessive force claim that Officer Carney escorted Coble several steps on a broken ankle and allowed him to fall on the driveway. The First Amended Complaint does not mention, however, the failure to flush chemical spray from Coble's face with water as a basis for the excessive force claim.

To survive summary judgment, Coble must do more than simply allege that certain actions by Officer Carney violated his Fourth Amendment rights. See <u>Anderson</u>, 477 U.S. at 252. "The

13

mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Id.

In Scott v. Harris, 550 U.S. 372, 374 (2007), the Supreme Court considered the question "whether a law enforcement official can, consistent with the Fourth Amendment, attempt to stop a fleeing motorist from continuing his public-endangering flight by ramming the motorist's car from behind." The case was decided in the courts below on motion for summary judgment raising a qualified immunity defense. The parties presented widely divergent views of the facts, and because the case was presented on motion for summary judgment without a jury finding of the facts, the Supreme Court reiterated that "[w]hen things are in such a posture, courts are required to view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'" Id. at 378. In a qualified immunity analysis, the high court said, this usually means taking as true the plaintiff's version of the facts. Id.

There was, however, "an added wrinkle" of a videotape that was taken by a police car camera during the high speed chase that captured the events in question. Id. There were no allegations that the videotape was doctored or altered or that what it depicted differed from what actually happened. Id. The Supreme Court observed that the "videotape quite clearly contradicts the version of the story told by [plaintiff] and adopted by the Court of Appeals." Id. According to the court of appeals' opinion, the Supreme Court said, "one gets the impression that [plaintiff], rather than fleeing from police, was attempting to pass his driving test[.]" Id. The court of appeals accepted plaintiff's version that he remained in control of his vehicle, slowed for turns and intersections, and typically used his indicators for turns. Id. He did not run any motorists off the road nor did he threaten pedestrians. Id.

The videotape, the Supreme Court said, "tells quite a different story." Id. at 379. The video showed plaintiff's car

> racing down narrow, two-lane roads in the dead of night at speeds that are shockingly fast. We see it swerve around more than a dozen other cars, cross the double-yellow line, and force cars traveling in both directions to their respective shoulders to avoid being hit. [footnote omitted] We see it run multiple red lights and

14

> travel for considerable periods of time in the occasional center left-turn only lane, chased by numerous police cars forced to engage in the same hazardous maneuvers just to keep up.  Far from being the cautious and controlled driver the lower court depicts, what we see on the video more closely resembles a Hollywood-style car chase of the most frightening sort, placing police officers and innocent bystanders alike at great risk of serious injury.

Id.  In light of the disparity in the facts, the Supreme Court reiterated the well-known rule that at "the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts."  Id. (citing Fed.R.Civ.P. 56(c)).  When the moving party has carried its burden under Rule 56(c), the opponent "'must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no "genuine issue for trial."'"  Id. (quoting Matsushita Elec. Indus. Co., 475 U.S. at 586-587).  Importantly, the Supreme Court stated, when "opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  Id.

While not precisely on all fours, Scott is instructive as to how this Court should handle on summary judgment the differences that are apparent in the parties' versions of the facts–first, as stated by Coble in his deposition that he screamed the whole time he was escorted on his broken leg, called Officer Carney every name he could think of to get him to stop, and Officer Carney then dropped him so that he fell face down on the pavement–compared with the audiotape of the incident presented by Defendants which blatantly contradicts Coble's version of the events.  Presented with the audiotape which reveals what actually transpired, the Court is not required under Scott to accept Coble's version of what happened after he was handcuffed.  Listening to the audiotape, no reasonable jury could find by a preponderance of the evidence that Coble screamed during the first few steps while he was being escorted, that he called Officer Carney names to get him to stop walking, or that Coble "splattered" on the pavement.  To the contrary, the audiotape reveals only the sound of shuffling bodies as if the three men were walking, and Coble was silent.  After a few moments, Coble cried out that his leg was broken, and the shuffling stopped.  An officer said, "Sit

15

down!" There is no audible noise that one could associate with a body dropping or "splattering" to the pavement. Coble simply tells the officers repeatedly, "You broke my leg!" and Officer Bilbrey called for emergency medical assistance immediately. The testimony of Officers Carney and Bilbrey square with the audiotape, while Coble's testimony does not. Therefore, under Scott, the Court need not adopt Coble's version in ruling on the motions for summary judgment. Coble has not generated a genuine issue of material fact for jury trial on whether Officer Carney used excessive force against him after the handcuffs were placed and Coble was under control, even where such an excessive force claim would not be barred by Coble's guilty plea to resisting arrest.

     *2. Qualified immunity*

     In addition, the Court concludes that Officer Carney is entitled to qualified immunity. This doctrine protects governmental officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Qualified immunity is an immunity from suit rather than a mere defense to liability, and the doctrine balances the need to hold public officials accountable when they exercise power irresponsibly with the need to shield officials from liability when they perform their duties reasonably. Pearson v. Callahan, — U.S. —, 129 S.Ct. 808, 815 (2009).

     In Saucier v. Katz, 533 U.S. 194 (2001), the Supreme Court mandated a two-step sequence for resolving government officials' qualified immunity claims. First, a court must decide whether the facts as alleged or established by plaintiff constitute the violation of a constitutional right. Second, if the plaintiff satisfies the first step, the court must then decide whether the right at issue was "clearly established" at the time of the defendant's alleged misconduct. Id. at 201. In Pearson the Supreme Court eliminated the requirement that courts follow this mandated process, even though it may be beneficial. Now this Court may exercise its sound discretion to decide which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand. Pearson, 129 S.Ct. at 818.

In <u>Scott</u>, 550 U.S. at 380-381, which was decided before <u>Pearson</u>, the Supreme Court followed the mandatory two-part qualified immunity test and considered first whether the plaintiff had shown the violation of a constitutional right. The Supreme Court applied the Fourth Amendment analysis of <u>Graham</u>, 490 U.S. at 388, to determine whether the police officer's actions were objectively reasonable. <u>Scott</u>, 550 U.S. at 381. The Supreme Court explained in <u>Scott</u> that, "[a]t the summary judgment stage . . . once we have determined the relevant set of facts and drawn all inferences in favor of the non-moving party *to the extent supportable by the record* . . . the reasonableness of [the police officer's] actions . . . is a pure question of law." <u>Id.</u> at 381 n.8 (emphasis in original).

The Court concludes that considering first in this case whether any violation of a constitutional right has been shown is the most efficient way to proceed. In determining the objective reasonableness of Officer Carney's actions, the Court must balance the nature and quality of the intrusion on Coble's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion. <u>See</u> <u>id.</u> at 383.

The Supreme Court's jurisprudence "has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." <u>Graham</u>, 490 U.S. at 396. Because the Fourth Amendment's test for "reasonableness" is not capable of precise definition or mechanical application, careful attention must be paid to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officer or others, and whether the suspect is actively resisting arrest or attempting to evade arrest by flight. <u>Id.</u>

"The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." <u>Id.</u> Not every push or shove violates the Fourth Amendment "'even if it may later seem unnecessary in the peace of a judge's chambers[.]'" <u>Id.</u> (quoted case omitted). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments–in

17

circumstances that are tense, uncertain, and rapidly evolving–about the amount of force that is necessary in a particular situation." Id. at 396-397. The focus must be on the objective reasonableness of the officer's actions in light of the facts and circumstances confronting him, without regard to the officer's underlying intent or motivation. Id. at 397. Coble bears the burden to prove that Officer Carney's use of force against him was unreasonable under the circumstances. See Miller v. Taylor, 877 F.2d 469, 472 (6th Cir. 1989).

It is undisputed that Officer Carney watched Coble enter the highway ahead of him from Bob and Rhonda's Sports Grill and drive down the road, weaving over the white fog line two or three times. To initiate a drunk driving investigation, Officer Carney turned on his blue lights, but Coble did not stop. Coble continued driving to his driveway, turned in, and continued all the way to the top, stopped, got out, and walked toward the police car with his hands in his jacket pockets. It was dark, Officer Carney was alone in his police vehicle, he was not familiar with Coble or the area, and he did not know if Coble had any weapons on him or if anyone else was inside the residence. To protect his own safety until he could investigate further, Officer Carney ordered Coble to get back in his vehicle, but he did not comply. When that did not work, Officer Carney directed Coble to come to him, but that did not work either. Coble did not respond verbally to questions about whether he had any guns or knives on him. Instead, he engaged in a verbal exchange with Officer Carney, telling him he was out of the City's jurisdiction and to get off his property. Coble's speech was slurred, further indicating his intoxication. Coble walked away from Officer Carney toward the house. Officer Carney shouted for him to stop repeatedly, but Coble kept walking. Officer Carney did not know if Coble would gain access to a weapon in the house or if someone else would appear at a window or door with a weapon. Officer Bilbrey had not yet arrived. To stop Coble, Officer Carney used chemical spray and a take-down maneuver he learned at the law enforcement academy he attended a few months before. Coble continued to resist, and finally, after Officer Bilbrey arrived, Coble was subdued by the two officers and handcuffed. He was lifted up and escorted, and

Coble walked along silently until he called out that his leg was broken. The officers promptly lowered him to a sitting position and called for emergency medical help.

It is certainly unfortunate that the take-down maneuver caused Coble to suffer such a serious ankle injury, but the Court concludes as a matter of law that Officer Carney's actions were objectively reasonable under all the circumstances. See Scott, 550 U.S. at 381; Graham, 480 U.S. at 388. Coble appeared to be driving while intoxicated, he evaded Officer Carney's attempt to stop him for investigation on the highway, and once stopped, he physically resisted arrest. Officer Carney's use of force short of hard force–that is, the use of chemical spray with a simultaneous soft-hands take-down maneuver–must be balanced against the important governmental interests at stake, which included Officer Carney's intention, supported by probable cause, to arrest Coble and protect the public from a drunk driver who might return to the highways if allowed to go about his business, as well as his desire to protect his own safety in the line of duty.

Coble produced no evidence that the take-down maneuver Officer Carney used was previously known by Officer Carney, the City, the law enforcement academies, or anyone else to cause a broken ankle. Officer Carney learned the technique during his law enforcement training; it was not something he simply designed of his own accord. After Coble's injury, the police department took prompt action to counsel Officer Carney not to use the maneuver again and to be sure that none of the officers in the department used the maneuver.

As explained above, the Court has viewed the facts in the light most favorable to Coble, the non-moving party, to the extent those facts are supported by the record. See Scott, 550 U.S. at 381 n.8. The Court does not adopt Coble's version as to what happened to him after he was handcuffed. Further, Coble did not present any evidence that Officer Carney knew Coble's leg was broken when he and Officer Bilbrey hoisted Coble to a standing position and began escorting him across the driveway or that Officer Carney forced Coble to walk on a broken leg with the intent to punish him or cause him pain. The audiotape reveals that Officer Carney and Officer Bilbrey acted reasonably in stopping their escort as soon as Coble complained to them that his leg was broken. They lowered

19

him to a sitting position and Officer Bilbrey applied pressure to the wound to stop bleeding and called for medical help. Coble was transported by helicopter to Vanderbilt for medical care. With emergency medical personnel quickly present on the scene within six minutes after the incident started, it was reasonable for Officer Carney to defer to the medical responders to wash Coble's eyes and face of the chemical spray, especially when Officer Carney testified this was the ordinary procedure followed when chemical spray was used, and Coble has not challenged that testimony. When all of the circumstances are considered, the Court concludes that Officer Carney's use of force was objectively reasonable and he is entitled to qualified immunity.

**B. The false arrest claim**

Although Officer Carney and Coble did not specifically address Coble's claim for false arrest, the Court concludes that the claim is without merit and Officer Carney is entitled to summary judgment on the claim. To prevail on a § 1983 claim for wrongful arrest, Coble must prove that Officer Carney lacked probable cause to arrest Coble without a warrant for driving while under the influence of an intoxicating substance. See Logsdon v. Hains, 492 F.3d 334, 341 (6th Cir. 2007). Probable cause exists if the facts and circumstances known to the officer warrant a prudent man in believing that the offense has been committed. Id.

The Court previously set out some of the facts supporting probable cause for the DUI arrest. Additionally, Coble's blood alcohol content was 0.16, twice the legal limit, and he entered a guilty plea and was convicted of DUI. Thus, Coble admitted that Officer Carney had probable cause to arrest him for DUI. This claim fails on the merits.

**C. The City's entitlement to summary judgment**

Coble claims that the City failed to implement appropriate policies as to the excessive use of force, but the record shows undisputedly that the City had in place an excessive force policy prior to the Coble incident, and the City's expert confirms that the policy was appropriate and that Officer Carney's actions complied with the policy. Moreover, because Coble's excessive force and false arrest claims against Officer Carney fail on summary judgment, Coble cannot hold the City liable

on theories of failure to train or respondeat superior. See Davenport v. Causey, 521 F.3d 544, 554 (6th Cir. 2008) (observing that plaintiff must first establish police officer committed constitutional violation before municipality may be held liable for failure to train); Ford v. County of Grand Traverse, 535 F.3d 483, 495 (6th Cir. 2008) (noting municipality may be found liable only if unconstitutional governmental policy or custom inflicts harm).

In any event, there is no evidence in this record that the City failed to train or supervise Officer Carney. Before assuming his law enforcement position, Officer Carney attended and graduated from a ten-week law enforcement training academy. He completed all certification requirements and was certified by the State of Tennessee Police Officers' Standards and Training Commission ("POST"). He successfully completed the Field Officer Training program conducted by the City. He was familiar with police policies and tried to follow them during the incident with Coble. Prior to Coble's arrest, the City police department had not received any complaints about Officer Carney, nor had he been disciplined in any manner. Once Coble's injury occurred, police department supervisors counseled Officer Carney and other officers not to use the take-down maneuver. There is no basis for City liability on these facts, and the City is entitled to summary judgment.

**D. The state-law claims**

Having determined that Officer Carney and the City are entitled to summary judgment on Coble's federal claims brought under § 1983, the Court declines to exercise supplemental jurisdiction over Coble's state-law claims for negligence, negligent infliction of emotional distress, and negligent training and supervision against the City, and for reckless infliction of emotional distress and assault and battery against Officer Carney. See Thornton v. Federal Express Corp., 530 F.3d 451, 454 n.1 (6th Cir. 2008). Those claims will be dismissed without prejudice.

## IV. CONCLUSION

For all of the reasons stated, Officer Carney and the City have established that they are entitled to summary judgment as a matter of law on Coble's federal claims. Accordingly, the § 1983

claims will be dismissed with prejudice and the state-law claims will be dismissed without prejudice in light of the Court's decision not to exercise supplemental jurisdiction.

An appropriate Order will be entered.

_____
ROBERT L. ECHOLS
UNITED STATES DISTRICT JUDGE